#60281682 Acct.

EXHIBIT B

# QWEST COMMUNICATIONS CORPORATION Q.GUARANTEED SERVICE AGREEMENT

| Select Term and Monthly Commitment | $100 ☐ | $250 ☐ | $500 ☐ | $1,000 ☐ | $2,000 ☐ | $4,000 ☐ | $7,000 ☐ | $12,000 ☐ | $20,000 ☐ | $35,000 ☐ | $50,000 ☒ | $75,000 ☐ | $100,000 ☐ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | QWEST OFFICE USE ONLY | | | | | | | | | | | | |
| Month to Month Term ☐ | 800010 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 Year Term ☐ | 810011 | 810021 | 21005* | 810101 | 810202 | 810402 | 810702 | 811202 | 812003 | 813503 | 815003 | 817503 | 819993 |
| 2 Year Term ☐ | 820011 | 820021 | 22005* | 820*01 | 820202 | 820402 | 820702 | 821202 | 822003 | 823503 | 825003 | 827503 | 829993 |
| 3 Year Term ☒ | 830011 | 830021 | 830051 | 830101 | 830202 | 830402 | 830702 | 831202 | 832003 | 833503 | 835003 | 837503 | 839993 |

Promotional Voice Discount and Code:

Standard Q.Guaranteed Rates ("Interstate Discount" refers to 0%, "Intrastate Discount" refers to 0% and "Intl Discount" refers to 0%)

Promotional DATA Discount and Code:

Standard Data Rate ("Data Discount" refers to 0%).

1. **Parties; Definitions.** This Q.Guaranteed Service Agreement ("Agreement") is made by and between Qwest Communications Corporation, located at 1801 California Street, Denver, CO 80202 ("Qwest") and the customer identified below ("Customer"). Capitalized terms used herein are defined in this section and elsewhere herein. The effective date of this Agreement is the date on which the Agreement is executed by Qwest following Customer's execution ("Effective Date").

a. "Eligible Data Charges" shall include only the following types of Customer's total monthly Q.Guaranteed charges (based on the applicable Service Schedule rates associated with the designated Term and Monthly Commitment) for usage of: (a) domestic private line interexchange carrier service; (b) domestic Qwest frame relay ports and permanent virtual circuits ("PVC"); (c) domestic Qwest ATM ports, PVCs and switched virtual circuits ("SVC"); and (d) Qwest On-Net Local Access Service, but shall not include Excluded Charges.

b. "Eligible Voice Charges" shall include only the following types of Customer's total monthly Q.Guaranteed charges (based on the applicable Service Schedule rates associated with the designated Term and Monthly Commitment) for usage of: (a) interstate, intrastate, intraLATA or international outbound voice service; (b) interstate, intrastate, intraLATA or international 8XX inbound voice service; (c) Qwest calling card service and (d) Qwest broadcast fax service, but shall not include Excluded Charges.

c. "Excluded Charges" refers to dedicated access/egress (or related) charges imposed by third parties (such as local exchange carriers) or charges imposed by a GSP; any MRCs not referenced in the Contributing Charges; non-recurring charges ("NRCs"); taxes; surcharges (except Qwest WorldCard℠ surcharges); Qwest audio teleconferencing usage charges; and any other charges not described in Contributing Charges below.

d. "In Region" refers to those states in which Qwest is prohibited by law from providing interLATA services (including Global Service Provider ("GSP") services), which states presently are Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington and Wyoming; provided, however, that any particular state in which Qwest receives authority to provide such interLATA services shall no longer be deemed an In Region state.

e. "MRC" refers to monthly recurring charge.

f. "Out Of Region" refers to Service provided outside the In Region states.

2. **Service Schedule; Regulatory Considerations.** Qwest will provide to Customer the international, interstate and intrastate telecommunications service(s) (the "Services") as set forth in this Agreement. The applicable Qwest Rate and Services Schedule(s) ("Service Schedule"), found at www.qwest.com and at the Qwest Reception Area at 1801 California Street, 1st Floor, Denver, CO 80202, is incorporated into this Agreement by reference and is a part of this Agreement. To the extent Services are tariffed, Qwest's FCC Tariffs, No. 2 and No. 3 and any applicable intrastate tariff of Qwest and/or its affiliates ("Tariffs") will apply and, in such cases, references in this Agreement to Service Schedule(s) shall instead be deemed to refer to the applicable Tariff. Qwest may from time to time modify the Tariff(s) or Services Schedule(s). Qwest will post changes to the Service Schedules(s) to the web-site listed above and continued use of the Services will constitute acceptance of the changes. Federal law prohibits Qwest from providing certain interLATA long distance services In-Region.

3. **Term; Termination.** The initial term of this Agreement beginning on the Effective Date is designated above. The initial term and any renewal term shall each be referred to herein as the "Term". Either Customer or Qwest may terminate this Agreement at the end of the Term by providing written notice at least thirty (30) days prior to the conclusion of such Term. Customer's notice of termination shall be in writing and either transmitted via mail, facsimile or e-mail to: Qwest Communications Corporation, Attention: Dublin Disconnect Center, 4650 Lakehurst Drive, Dublin, OH 43016, FAX 888.387.6833, e-mail: GSMdisconnects@qwest.com. If written notification is not submitted to Qwest at least thirty (30) days prior to expiration of this Agreement and Qwest has not given notice of termination to Customer, this Agreement shall automatically renew at the same Monthly Commitment level and then current Term and at the Service Schedule rates in effect at the time of such renewal. Qwest is providing service pursuant to the Service Schedule and if Customer terminates early, Customer will be subject to the early termination charges stated in such Service Schedule.

4. **Monthly Commitment.** Customer hereby agrees to the minimum monthly usage commitment designated above ("Monthly Commitment"). During any month of the Term that Customer's total "Contributing Charges" falls below the Monthly Commitment, Customer shall pay for each such month the actual amount billed for that service plus the difference between the Contributing Charges and the Monthly Commitment. To determine Contributing Charges under this Agreement, Qwest will count Customer's total charges for the following (less Excluded Charges applicable to such service): intrastate, interstate and international outbound voice services usage; intrastate, interstate and international inbound 8XX voice services usage; directory assistance usage; Qwest WorldCard℠ usage and surcharges; Qwest Frame Relay℠ Port, Gateway Connection and PVC MRCs; Qwest ATM Port, PVC, and SVC MRCs; and DSL ATM Gateway Connection, and ATM Gateway Connection MRCs; Private Line interexchange Carrier charges; Qwest Dedicated Internet Access MRCs; Qwest broadcast fax usage; Q Port℠ MRCs; Qwest Web Hosting Ethernet MRCs; Qwest Web Hosting Rack and Cage MRCs; Qwest Web Hosting Enhanced and Premium Server Monitoring MRCs; Qwest international and domestic Virtual Private Network ("VPN") connectivity MRCs; Qwest Out of Region Digital Subscriber Line ("DSL") Service MRCs (excluding DSL Service provided In Region by Qwest's affiliate, Qwest Corporation); and Qwest On-Net Local Access Service MRCs.

5. **The Guarantee!** In consideration of Customer's commitment to use Q.Guaranteed Service for the specified Term and at the Monthly Commitment level, Qwest agrees to provide Q.Guaranteed Service domestic switched and dedicated long distance services for the duration of this Agreement at the Service Schedule rates in effect on the Effective Date. This guarantee does not apply to rates for Qwest international, DIA, Web Hosting, VPN and DSL services.

© 2001 Qwest Communications Corporation

*** TOTAL PAGE.03 ***

# QWEST COMMUNICATIONS CORPORATION Q.GUARANTEED SERVICE AGREEMENT

**6. Competitive Promotion.** In consideration of Customer's commitment to use Q.Guaranteed Service for the specified Term and at the Monthly Commitment level, Qwest agrees to provide Q.Guaranteed Service to Customer at the Service Schedule rates in effect on the Effective Date less a discount, to the extent applicable, equal to (a) the Interstate Discount multiplied by Customer's Interstate Eligible Voice Charges, (b) the Intrastate Discount multiplied by Customer's intrastate and intraLATA Eligible Voice Charges, which discount will be applied to Customer's interstate usage charges, (c) the International Discount multiplied by Customer's International Eligible Voice Charges and (d) the Data Discount multiplied by Customer's Eligible Data Charges. Customer represents that it has received from a competitor of Qwest an offer comparable to the offer set forth in this Agreement.

**7. Regulatory Activity.** Notwithstanding any statement to the contrary contained in this Agreement or the Service Schedule, in the event that any regulatory agency, legislative body or court of competent jurisdiction promulgates or modifies existing regulations ("Regulatory Activity"), Qwest reserves the right, at any time and without notice, to: (a) pass through to Customer all, or a portion of, any charges or surcharges directly or indirectly related to such Regulatory Activity or (b) modify the rates and/or other terms contained in this Agreement and/or the Service Schedule to reflect the impact of such Regulatory Activity.

**8. Publicity.** Customer shall not: (a) make any disclosure to any other person or issue any press release or other public announcement regarding this Agreement or any relation between Customer and Qwest or (b) use the name, trademarks or other proprietary identifying symbol of Qwest or its affiliates, without Qwest's prior written consent. In the case of a press release or other public announcement, such prior written consent may only be provided by authorized representatives of both Qwest's Legal and Corporate Communications departments. Qwest shall, in addition to any other available remedies at law or equity, have the right to terminate this Agreement and any other agreements between the parties if Customer violates this provision.

**9. Dispute Resolution.** Any dispute arising out of this Agreement which cannot be resolved by the parties will be settled by arbitration, which will be conducted in accordance with the JAMS Comprehensive Arbitration Rules. Either party may initiate arbitration by providing written demand for arbitration to JAMS (with a copy to the other party), a copy of this Agreement and the administrative fee required by JAMS. The written demand for arbitration shall be sufficiently detailed to permit the other party to understand the claim(s) and identify witnesses and relevant documents. The remaining cost of the arbitration, including arbitrator's fees, shall be shared equally by the parties; provided, however, each party shall bear the cost of preparing and presenting its own case (including its own attorney's fees). The arbitration will be held in Denver, Colorado. The arbitrator has no authority to award any indirect, incidental, special, punitive, or consequential damages, including damages for lost profits. The arbitrator's decision shall follow the plain meaning of the Agreement and shall be final, binding, and enforceable in a court of competent jurisdiction. If either party fails to comply with the dispute resolution process set forth herein (e.g., nonpayment of an arbitration award) and a party is required to resort to court proceedings to enforce such compliance, then the non-complying party shall reimburse all of the costs and expenses incurred by the party requesting such enforcement (including reasonable attorneys' fees).

**10. Billing and Usage-related Information.** In the course of providing Service to Customer, Qwest will have access to certain billing and usage-related information about the quantity, technical configuration, type, destination, and amount of use of Customer's telecommunications services. Customer has a right, and Qwest has a duty, to protect the confidentiality of this information. This information may be useful to tailor products and services to Customer's needs and to enhance Qwest's ability to meet Customer's needs. By signing below, Customer expressly authorizes Qwest, its affiliates, or its agents, to use such information to determine if Customer could benefit from other Services offered by Qwest, its affiliates, or its agents, and market them to Customer, and to respond to Customer's concerns if Customer has become dissatisfied with the Services during the Term. Customer's authorization will not harm or otherwise affect the quality of Service provided hereunder, and Qwest will honor Customer's choice until Customer expressly tells Qwest otherwise.

**11. Miscellaneous.**

a. Customer may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Qwest.

b. The terms, representations, warranties and agreements of the parties set forth in this Agreement are not intended for, nor shall they be for the benefit of or enforceable by, any person or entity that is not a party to this Agreement.

c. If any provision of this Agreement is held to be unenforceable, the unenforceable provision shall be construed as nearly as possible to reflect the original intent of the parties and the remaining provisions shall remain in full force and effect.

d. Neither party's failure to insist upon strict performance of any provision of this Agreement shall be construed as a waiver of any of its rights hereunder. All terms and provisions of this Agreement which should by their nature survive the termination of this Agreement shall so survive.

e. The terms of this Agreement, including the Service Schedule, shall prevail notwithstanding any conflicting terms of any order form or other form for purchase or payment submitted by Customer to Qwest. In the event of a conflict between the terms of the Service Schedules and this Agreement, the terms of this Agreement shall control. In the event of a conflict between the terms of a Tariff and this Agreement, the terms of the Tariff shall control.

f. This Agreement, and all causes of action arising out of this Agreement, will be subject to the Communications Act of 1934, as amended (the "Act"), or, if any part of this Agreement is not governed by the Act, by the domestic law of the State of New York without regard to its choice of law principles.

g. This Agreement, including the Service Schedule, constitute one and the same legally binding instrument and the entire agreement between Customer and Qwest with respect to the subject matter hereof, and supersedes all prior offers, contracts, agreements, representations and understandings made to or with Customer by Qwest, whether oral or written, relating to the subject matter hereof. Except for Service Schedule modifications initiated by Qwest, all amendments to this Agreement shall be in writing and signed by authorized representatives of the parties. Qwest may assume that any employee of Customer who gives written notice or other instruction in connection with this Agreement has the authority to do so.

The undersigned parties have read and agree to the terms and conditions set forth in this Q.Guaranteed Service Agreement.

| QWEST COMMUNICATIONS CORPORATION | CUSTOMER: |
|---|---|
| By: [signature] | By: [signature] |
| Name: Pat Dillon | Name: Stephen Cyr |
| Title: MGR | Title: [illegible] Communications |
| Date: 31 Oct 2001 | Date: 10/31/01 |
| | Address: 1 Catamore Bl. |
| | Attn. for notices: |



OCT 31 2001 16:41

PAGE.02

[illegible]